**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JOSHUA SHANAHAN**, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**EVERGREEN RECYCLING, LLC,**<br><br>and<br><br>**THE STERLING GROUP, L.P.,**<br><br>Defendants. | ) | Case No.<br><br><br><br><br><br>**CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 23**<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. This is a class action brought on behalf of approximately 200 former employees of Evergreen Recycling, LLC ("Evergreen") and The Sterling Group, L.P. ("Sterling") (collectively, "Defendants") who lost their jobs in February 2026 when Defendants permanently closed Evergreen's manufacturing facilities in Clyde, Ohio and Albany, New York without providing 60 days' advance written notice as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101-2109, and the Ohio WARN Act, Ohio Revised Code § 4113.31.

2. On or about February 24, 2026, Evergreen announced it would be conducting mass layoffs or plant closings at its manufacturing facilities in Clyde, Ohio and Albany, New York. Employees received no advance notice. They simply showed up to work and were told the plants were closing.

3. But this action is about more than Evergreen's failure to provide legally required notice. It is about a private equity firm – Sterling – that created Evergreen, controlled every

significant aspect of its operations, installed and removed its chief executives, directed over $200 million in capital investment, applied its proprietary operational methodology to the business, and maintained centralized oversight of Evergreen's human capital, financial operations, technology, and strategic direction. Having exercised that degree of control, Sterling cannot now disclaim responsibility for the consequences of the enterprise's collapse.

4. Under well-established precedent, a parent company or private equity sponsor that exercises sufficient operational control over a subsidiary may be held liable as a *single employer* under the WARN Act. The five-factor test applied by courts examines: (1) common ownership; (2) common directors or officers; (3) *de facto* exercise of control; (4) unity of personnel policies emanating from a common source; and (5) dependency of operations. As set forth in detail below, the publicly available record – largely drawn from Sterling's own statements – satisfies each of these factors.

5. Sterling did not passively invest in Evergreen. Sterling *built* Evergreen. Sterling's own website states that it "executed the carve-out" of a recycling division from one of its existing portfolio companies, "merged it with a facility acquired through a bankruptcy process," and then "embarked on an integration and turnaround plan." Sterling describes itself as having "built Evergreen into a national recycler." Sterling reports that it "invested heavily in capital expenditures to add capacity and upgrade its facilities." These are not the words of a passive investor. They are the words of an operator.

6. Plaintiff Joshua Shanahan ("Plaintiff"), on behalf of himself and all similarly situated former employees, seeks to recover up to 60 days of back pay and benefits, plus interest, reasonable attorneys' fees and costs, as provided under 29 U.S.C. § 2104 and Ohio Rev. Code § 4113.31.

## II. THE PARTIES

### A. Plaintiff

7. Plaintiff Joshua Shanahan is an adult individual who was employed by Evergreen at its facility located in Clyde, Ohio. Plaintiff was employed at the Clyde facility at the time of the plant closing in February 2026 and suffered an employment loss within the meaning of the WARN Act, 29 U.S.C. § 2101(a)(6), without receiving 60 days' advance written notice.

### B. Defendants

8. Defendant Evergreen Recycling, LLC ("Evergreen") is a limited liability company that was, at all relevant times, headquartered in Clyde, Ohio. Evergreen operated polyethylene terephthalate ("PET") recycling and manufacturing facilities in Clyde, Ohio; Albany, New York; and Amherst, Nova Scotia, Canada. Evergreen may be served through its registered agent for service of process, or through such other means as this Court may authorize.

9. Defendant The Sterling Group, L.P. ("Sterling") is a limited partnership organized under the laws of the State of Texas, with its principal office located at Nine Greenway Plaza, Suite 2400, Houston, Texas 77046. Sterling is a private equity firm founded in 1982 that manages approximately $9.4 billion in assets under management across multiple fund vehicles. Sterling describes itself as "an operationally focused middle market private equity firm" that targets "controlling interests in basic manufacturing, industrial services and distribution companies." Sterling owned a controlling interest in Evergreen and, as alleged in detail herein, exercised sufficient operational control over Evergreen to constitute a single employer within the meaning of the WARN Act.

10. At all relevant times, Defendants, jointly and as a single employer, employed 100 or more employees, excluding employees who worked fewer than 20 hours per week, within the

meaning of 29 U.S.C. § 2101(a)(1). Defendants were therefore an "employer" subject to the requirements of the WARN Act.

## III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, specifically the WARN Act, 29 U.S.C. §§ 2101-2109.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same set of operative facts as the federal WARN Act claims and form part of the same case or controversy.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the permanent closure of Evergreen's Clyde, Ohio manufacturing facility, which is located in Sandusky County, Ohio, within the Northern District of Ohio, Western Division.

14. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Evergreen Recycling, LLC maintained its headquarters and principal place of business in this District.

15. This Court has personal jurisdiction over Defendant Evergreen Recycling, LLC because Evergreen was headquartered in this District, operated its principal manufacturing facility in this District, and employed the majority of the affected workforce in this District.

16. This Court has personal jurisdiction over Defendant The Sterling Group, L.P. because Sterling owned a controlling interest in an Ohio limited liability company headquartered in this District, directed the operations of that company from its formation through its closure, directed the investment of over $200 million into facilities located in this District, installed and

removed the chief executive officers of an entity operating in this District, and, upon information and belief, directed or approved the decisions that led to the plant closing and mass layoff that are the subject of this action. Sterling's contacts with this District are sufficient to satisfy due process under both Ohio's long-arm statute, Ohio Rev. Code § 2307.382, and the Fourteenth Amendment.

## IV. BACKGROUND FACTS

### A. The Sterling Group's Operational Control Model

17. Sterling was founded in 1982 and is headquartered in Houston, Texas. Sterling describes itself as "an operationally focused middle market private equity firm" that "partners with management teams to grow and build winning businesses in the industrial sector." Sterling targets "controlling interests" in portfolio companies with equity investments ranging from $50 million to $350 million.

18. Sterling does not operate as a passive investor. Sterling applies a proprietary operational playbook called the "Seven Levers" methodology to all of its portfolio companies. The seven levers are: (1) Human Capital; (2) Strategy; (3) Execution; (4) Commercial; (5) Operations; (6) Technology; and (7) M&A. A dedicated Sterling partner or operating partner holds responsibility for each lever and deploys directly into portfolio companies to execute it.

19. Sterling maintains a "Portfolio Resources Group" consisting of operating partners and directors who work directly with portfolio companies across the Seven Levers. These include, among others: (a) an Operating Partner for Financial Operations who leads the "Execution lever" and works with portfolio companies "to evaluate and support financial operations"; (b) an Operating Partner for Technology who supports "technology-enabled growth initiatives at Sterling portfolio companies, including systems implementations, data management,

and AI"; (c) a Director of Operations who assists "Sterling portfolio companies in all areas of operational improvement, with a particular emphasis on procurement and supply chain"; and (d) a Partner for Human Capital who is responsible for "working across the firm's portfolio to help drive growth through comprehensive people strategies and the identification and acquisition of talent."

20. Sterling's operational approach generates approximately 70% of its investment returns from organic EBITDA growth – not from financial engineering or leverage – underscoring the depth of Sterling's operational involvement in its portfolio companies.

21. Sterling partners routinely serve on the boards of its portfolio companies. Upon information and belief, Sterling's pattern and practice is to place one or more Sterling partners on the board of every portfolio company it controls. Sterling has also placed its chosen executives as chief executive officers of portfolio companies and operates a Vice President program that embeds Sterling VPs at portfolio companies for one year in "a senior management position, reporting directly to the CEO."

22. Sterling maintains centralized legal, compliance, and risk management functions that extend to its portfolio companies. Sterling's General Counsel is responsible for advising "on strategy and tactics related to material litigation and disputes at both the firm level, and material items within portfolio companies" and for advising "portfolio companies on the correct approach to risk management coverage." Sterling also manages insurance programs for its portfolio companies, including professional liability, directors and officers, employment practices liability, cyber, and general liability coverage.

**B. Sterling's Creation and Control of Evergreen**

23. Sterling did not merely acquire Evergreen – Sterling *created* Evergreen. The formation of Evergreen involved a series of deliberate, fund-level decisions orchestrated entirely by Sterling.

24. In 2014, Sterling began studying the recycled plastics sector as a potential investment theme. In 2019, Sterling acquired Greenbridge (formerly Polychem Corporation), an Ohio-based packaging company, whose operations included a PET recycling division known as "Evergreen Plastics" located in Clyde, Ohio. Greenbridge became a Sterling portfolio company.

25. In May 2021, Sterling acquired the Riverside, California PET recycling plant formerly operated by CarbonLITE Holdings, LLC through a Section 363 bankruptcy sale for approximately $44 million.

26. On June 9, 2021, Sterling announced the formation of Evergreen as a new standalone "platform" company. Sterling accomplished this by carving out the recycling division from its existing portfolio company Greenbridge and merging it with the CarbonLITE assets. Sterling's own public announcement of the transaction stated: "Sterling executed the carve-out of Evergreen, the recycling division of current portfolio company Greenbridge Packaging, and merged it with the Riverside, CA, assets of CarbonLITE, which were acquired through a 363 bankruptcy process."

27. In November 2021, Sterling directed Evergreen's acquisition of two additional PET recycling facilities—UltrePET in Albany, New York, and Novapet in Amherst, Nova Scotia – from wTe Corp.

28. In 2022, Sterling announced a total investment of $200 million across Evergreen's facilities, including a $22 million expansion adding approximately 54,000 square feet of capacity

at the Clyde, Ohio plant. Sterling also directed investments in robotic sorting and automation technology at Evergreen's facilities.

29. Sterling's own website describes its role in building Evergreen in unambiguous terms. Sterling states: "In 2021, Sterling saw the opportunity to build the nation's leading standalone PET recycling company. Through a series of complex transactions, Sterling has built Evergreen into a national recycler that processes over 11 billion PET bottles a year that might otherwise be landfilled. Sterling has invested heavily in capital expenditures to add capacity and upgrade its facilities, including investing in automation that has increased the yields of the company's facilities."

30. At the time of Evergreen's formation, Scott MacLaren, a Partner at The Sterling Group, stated: "We look forward to Partnering with management to bring our collective decades of experience operating recycling facilities to the continued expansion of Evergreen."

**C. Common Directors, Officers, and Management**

31. Following the carve-out, Omar Abuaita served simultaneously as Chief Executive Officer of *both* Evergreen and Greenbridge, two separate Sterling portfolio companies, from approximately June 2021 through May 2022, a period of approximately eleven months.

32. In May 2022, Gary Rosenthal, a Partner at The Sterling Group, announced that Abuaita would shift his focus full-time to Evergreen, and that Marcelo Passos would replace him as CEO of Greenbridge. This CEO transition was announced by a Sterling partner, not by the boards of either Evergreen or Greenbridge.

33. In March 2023, when Abuaita retired as CEO of Evergreen, he was replaced by Gary Alstott. Upon information and belief, Alstott's appointment was directed or approved by Sterling.

34. At least one Sterling investment professional, identified on Sterling's own team page as a VP/Principal who joined Sterling in 2018, lists "Evergreen Recycling" and "Greenbridge" as direct portfolio company experience, confirming that Sterling personnel were actively involved in the management and operations of Evergreen.

35. Upon information and belief, one or more Sterling partners served on Evergreen's board of managers at all relevant times, consistent with Sterling's documented pattern and practice of placing its partners on the boards of all of its portfolio companies.

**D. Dependency of Evergreen's Operations on Sterling**

36. Evergreen was operationally, financially, and strategically dependent on Sterling at all relevant times.

37. Evergreen was carved out of Greenbridge, a Sterling portfolio company. Even after the carve-out, Evergreen maintained a direct supply relationship with Greenbridge, supplying recycled PET material for Greenbridge's use. The two companies shared the same CEO for approximately eleven months, shared the same press contacts, and Greenbridge's corporate website hosted Evergreen-related news and content.

38. Every significant acquisition in Evergreen's history – CarbonLITE, UltrePET, and Novapet – was directed and funded by Sterling. The $200 million capital investment program was directed by Sterling. Evergreen's COO/General Manager, Greg Johnson, publicly acknowledged Sterling's role, stating at a 2022 industry conference: "Overall, the partnership with Sterling and our expertise, coupled with the current demand in the market, has really driven our expansion in the market."

**E. Unity of Personnel Policies**

40. Sterling maintained a centralized Human Capital function that extended across all of its portfolio companies, including Evergreen. Claudine Lussier, a Partner at Sterling, was responsible for "developing and implementing people and talent management strategies at Sterling, as well as working across the firm's portfolio to help drive growth through comprehensive people strategies and the identification and acquisition of talent."

41. Sterling's Operating Partners and Directors deployed into portfolio companies to implement Sterling's methodologies across financial operations, technology, procurement, and supply chain management. Sterling's General Counsel advised portfolio companies on "risk management coverage," and Sterling managed insurance programs – including employment practices liability insurance – at the firm level for its portfolio companies.

42. Upon information and belief, Sterling's centralized human capital function influenced or directed Evergreen's hiring practices, compensation structures, and personnel policies. Further discovery will reveal the full extent of these unified personnel policies.

**G. The Plant Closings at Issue**

48. On February 24, 2026, Evergreen announced mass layoffs or plant closings affecting its Clyde, Ohio and Albany, New York facilities. Evergreen has stated the mass layoffs or plant closures will affect approximately 247, the majority of which had already occurred or would occur on February 24, 2026.

49. At the Clyde, Ohio facility, approximately 165 employees were terminated.

50. At the Albany, New York facility, approximately 82 employees were terminated.

51. All layoffs were expected to be completed by April 24, 2026.

52. None of the affected employees received 60 days' advance written notice of the plant closings as required by 29 U.S.C. § 2102(a). None of the affected employees at the Clyde, Ohio facility received 60 days' advance written notice as required by Ohio Rev. Code § 4113.31.

**H. Sterling and Evergreen Constitute a Single Employer**

53. Under the WARN Act, the term "employer" includes not only the entity that directly employs the affected workers but also any entity that operates as a "single employer" with that entity. Courts apply a five-factor test, weighing: (1) common ownership or financial control; (2) common directors and/or officers; (3) *de facto* exercise of control over day-to-day operations; (4) unity of personnel policies emanating from a common source; and (5) dependency of operations between the entities. No single factor is dispositive.

54. Application of these factors to the relationship between Sterling and Evergreen demonstrates that they are a single employer:

55. **Common Ownership.** Sterling owns a controlling interest in Evergreen. Sterling targets "controlling interests" in all of its portfolio investments, with equity investments ranging from $50 million to $350 million. Evergreen is consistently described in industry publications as "owned by The Sterling Group." Sterling created Evergreen through a carve-out from its own portfolio company, directed and funded every acquisition, and invested over $200 million in Evergreen's facilities. This factor is satisfied.

56. **Common Directors and Officers.** Omar Abuaita simultaneously served as CEO of Evergreen and Greenbridge (a sister Sterling portfolio company) for approximately eleven months. CEO transitions at Evergreen were announced by Sterling partners. At least one Sterling investment professional worked directly on the Evergreen account. Upon information and belief, Sterling partners sat on Evergreen's board of managers. This factor is satisfied.

57. **De Facto Exercise of Control.** Sterling created Evergreen by carving it out of an existing portfolio company and merging it with assets Sterling acquired through bankruptcy. Sterling directed all subsequent acquisitions, a $200 million capital investment program, technology and automation upgrades, and management transitions. Sterling applied its proprietary Seven Levers methodology to Evergreen, deploying Operating Partners and Directors to implement strategy across financial operations, technology, procurement, and human capital. Sterling's own statements describe these actions in the first person: "Sterling executed," "Sterling embarked," "Sterling has built," "Sterling has invested heavily." This factor is satisfied.

58. **Unity of Personnel Policies.** Sterling maintained a centralized Human Capital function, led by a Partner, responsible for "comprehensive people strategies" across all portfolio companies. Sterling managed insurance programs for portfolio companies at the firm level, including employment practices liability coverage. Sterling's General Counsel advised portfolio companies on risk management. Sterling's VP program embedded Sterling personnel at portfolio companies in senior management positions. Upon information and belief, Sterling's centralized functions influenced or directed Evergreen's personnel policies. This factor is satisfied.

59. **Dependency of Operations.** Evergreen was carved out of a Sterling portfolio company and maintained a direct supply relationship with that same company after the carve-out. Evergreen shared a CEO with a sister Sterling company for eleven months. Every significant acquisition and capital investment was directed and funded by Sterling.

60. All five factors of the single-employer test weigh in favor of treating Sterling and Evergreen as a single employer for purposes of the WARN Act.

## V. CLASS ALLEGATIONS

61. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of himself and two classes of similarly situated persons.

62. The **WARN Act Class** is defined as:

> All persons who were employed by Evergreen Recycling, LLC at its facilities in Clyde, Ohio and Albany, New York, and who suffered an employment loss as defined by 29 U.S.C. § 2101(a)(6) as a result of the plant closings that began on or about February 2026, without receiving at least 60 days' advance written notice.

63. The **Ohio WARN Act Subclass** is defined as:

> All persons who were employed by Evergreen Recycling, LLC at its facility in Clyde, Ohio, and who suffered an employment loss as a result of the plant closing that began on or about February 2026, without receiving at least 60 days' advance written notice as required by Ohio Rev. Code § 4113.31.

64. Plaintiff reserves the right to amend or modify the class definitions as appropriate before class certification.

65. **Numerosity.** The WARN Act Class includes approximately 247 former employees, and the Ohio WARN Act Subclass includes approximately 165 former employees. Joinder of all class members is impracticable given the size of the classes.

66. **Commonality.** Common questions of law and fact exist as to all members of each class, including but not limited to: (a) whether Defendants are "employers" within the meaning of the WARN Act and Ohio Rev. Code § 4113.31; (b) whether Sterling and Evergreen constitute a single employer; (c) whether the closures of the Clyde, Ohio and Albany, New York facilities constituted "plant closings" within the meaning of the WARN Act; (d) whether Defendants provided 60 days' advance written notice to the affected employees; (e) whether any exception to the WARN Act's notice requirements applies; and (f) the appropriate measure of damages.

67. **Typicality.** Plaintiff's claims are typical of the claims of the class members. Plaintiff, like all class members, was employed at an Evergreen facility, suffered an employment loss as a result of a plant closing, and did not receive 60 days' advance written notice.

68. **Adequacy.** Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff's interests are not antagonistic to or in conflict with the interests of the class members. Plaintiff has retained counsel experienced in class action litigation and WARN Act enforcement.

69. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual class members. The central issues, whether Defendants violated the WARN Act and Ohio Rev. Code § 4113.31 by failing to provide adequate notice, and whether Sterling and Evergreen are a single employer, are common to all class members and will be resolved on a class-wide basis. Individual damages can be calculated mechanically based on each employee's rate of pay, benefits, and date of termination.

70. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual class members' damages, while significant to each individual, are sufficiently modest in comparison to the expense and burden of individual litigation as to make it impractical for class members to seek redress on an individual basis. Concentrating the litigation in one forum will promote judicial economy and prevent inconsistent adjudications.

## VI. CAUSES OF ACTION

### COUNT I
**Violation of the Federal WARN Act, 29 U.S.C. §§ 2101-2109**
*(On Behalf of Plaintiff and the WARN Act Class Against All Defendants)*

71. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

72. At all relevant times, Defendants, jointly and as a single employer, were an "employer" as defined by 29 U.S.C. § 2101(a)(1), employing 100 or more employees, excluding employees who worked fewer than 20 hours per week.

73. The permanent closures of the Clyde, Ohio and Albany, New York facilities each constituted a "plant closing" within the meaning of 29 U.S.C. § 2101(a)(2), resulting in an "employment loss" for 50 or more employees at a single site of employment during a 30-day period.

74. Plaintiff and the WARN Act Class members were "affected employees" as defined by 29 U.S.C. § 2101(a)(5), who reasonably could have been expected to experience an employment loss as a consequence of the plant closings.

75. The WARN Act requires that an employer provide at least 60 days' advance written notice of a plant closing to each affected employee. 29 U.S.C. § 2102(a).

76. Defendants failed to provide Plaintiff and the WARN Act Class members with at least 60 days' advance written notice of the plant closings.

79. As a result of Defendants' violations of the WARN Act, Plaintiff and the WARN Act Class members are entitled to recover damages in the amount of back pay and benefits for the period of the violation, up to a maximum of 60 days, as provided by 29 U.S.C. § 2104(a)(1).

80. Plaintiff and the WARN Act Class members are further entitled to recover reasonable attorneys' fees and costs as provided by 29 U.S.C. § 2104(a)(6).

**COUNT II**
**Violation of the Ohio WARN Act, Ohio Rev. Code § 4113.31**
*(On Behalf of Plaintiff and the Ohio WARN Act Subclass Against All Defendants)*

81. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

82. Ohio Revised Code § 4113.31, effective September 29, 2025, requires employers in Ohio to comply with all requirements of the federal WARN Act and 20 C.F.R. §§ 639.1 to 639.10.

83. Ohio Rev. Code § 4113.31(C) provides that an employer must provide the notice required by 29 U.S.C. § 2102(a) if both of the following apply: (1) the employer employs 100 or more employees who in the aggregate work at least 4,000 hours per week; and (2) the employer lays off 50 or more employees at a single site of employment during any 30-day period.

84. At all relevant times, Defendants, jointly and as a single employer, employed 100 or more employees who in the aggregate worked at least 4,000 hours per week. Defendants laid off 165 employees at the Clyde, Ohio facility, a single site of employment, during a 30-day period. Accordingly, Defendants were required to comply with Ohio Rev. Code § 4113.31.

85. Ohio Rev. Code § 4113.31(E) requires that, not less than 60 days before the date a plant closing or mass layoff begins, an employer shall provide written notice to affected employees or their authorized representatives.

86. In addition to the federal WARN Act's notice requirements, Ohio Rev. Code § 4113.31 imposes enhanced content requirements for WARN notices, including detailed statements explaining the reason for the closure, whether it will be permanent or temporary,

information about available services for affected employees, and the total number of employees affected by job title and department. Ohio Rev. Code § 4113.31 also requires notice to the chief elected official of both the municipality and the county where the plant closing occurs.

87. Defendants failed to provide Plaintiff and the Ohio WARN Act Subclass members with at least 60 days' advance written notice of the plant closing at the Clyde, Ohio facility, in violation of Ohio Rev. Code § 4113.31. Upon information and belief, Defendants also failed to comply with the enhanced content and distribution requirements of Ohio Rev. Code § 4113.31.

88. Ohio Rev. Code § 4113.31 incorporates the remedies provided under the federal WARN Act for non-compliance. As a result of Defendants' violations of Ohio Rev. Code § 4113.31, Plaintiff and the Ohio WARN Act Subclass members are entitled to recover back pay and benefits for the period of the violation, up to a maximum of 60 days, plus reasonable attorneys' fees and costs.

## VII. RELIEF SOUGHT

WHEREFORE, Plaintiff, on behalf of himself and the classes defined herein, respectfully requests that this Court enter judgment against Defendants and grant the following relief:

a. An Order certifying the WARN Act Class and the Ohio WARN Act Subclass as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b. An Order declaring that Defendants violated the WARN Act, 29 U.S.C. §§ 2101-2109, by failing to provide at least 60 days' advance written notice to Plaintiff and the WARN Act Class members before the plant closings;

c. An Order declaring that Defendants violated Ohio Rev. Code § 4113.31 by failing to provide at least 60 days' advance written notice to Plaintiff and the Ohio WARN Act Subclass members before the plant closing at the Clyde, Ohio facility;

d. An Order declaring that The Sterling Group, L.P. and Evergreen Recycling, LLC are a single employer within the meaning of the WARN Act and Ohio Rev. Code § 4113.31;

e. An award to Plaintiff and the WARN Act Class members of back pay and benefits for each day of the WARN Act violation, up to a maximum of 60 days, as provided by 29 U.S.C. § 2104(a)(1);

f. An award to Plaintiff and the Ohio WARN Act Subclass members of back pay and benefits for each day of the Ohio WARN Act violation, up to a maximum of 60 days, as provided by Ohio Rev. Code § 4113.31;

g. An award of prejudgment and postjudgment interest at the maximum rate allowed by law;

h. An award of reasonable attorneys' fees and costs as provided by 29 U.S.C. § 2104(a)(6); and

j. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

/s/ Hans A. Nilges
Hans A. Nilges (0076017)
**NILGES LEGAL GROUP LLC**
7034 Braucher Street NW, Suite B
North Canton, OH 44720
Telephone: 330-470-4428
Facsimile: 330-754-1430
Email: hnilges@ohlaborlaw.com

Robi J. Baishnab (0086195)
**NILGES LEGAL GROUP LLC**
700 W St. Clair Ave., Suite 320
Cleveland, OH 44113
Telephone: 216-230-2955
Facsimile: 330-754-1430
Email: rbaishnab@ohlaborlaw.com

William "Jack" Simpson
**SIMPSON, PLLC**
100 Parkgate Dr., Ext., Suite 205
Tupelo, MS 38801
Telephone: 662-913-7811
Email: jack@simpson-pllc.com
*Pro Hac Vice Admission Anticipated*

*Attorneys for Plaintiff and the Putative Class*